UNITED STATES v. BELT.

(District Court, M. D. Pennsylvania. February 29, 1904.)

1. INDIANS—SCOPE OF STATUTE PROHIBITING SALE OF LIQUOR—CARLISLE STUDENTS.

Act Jan. 30, 1897, c. 109, 29 Stat. 506, prohibiting the sale of liquor "to any Indian, a ward of the government, under the charge of an Indian superintendent or agent, or any Indian, including mixed bloods, over whom the government through its departments exercises guardianship," extends to Indian students at the Carlisle school, which is maintained at the expense of the government under the direction of the Interior Department.

Indictment for selling liquor to Indian boys attending the United States school at Carlisle, Pa. On rule for new trial.

George M. Watson, for the rule.
S. J. M. McCarrell, U. S. Atty.

ARCHBALD, District Judge. The defendant was convicted of selling liquor to two Indian boys, one of the Kickapoo and the other of the Caddo Tribe, in attendance at the government school at Carlisle, Pa. This school is in charge of Col. Pratt, a retired officer of the United States army, detailed for the purpose, and is sustained by appropriations for the Department of Indian Affairs, under the direction of the Secretary of the Interior. Like other similar schools, it was established to aid in educating and civilizing the hitherto uncivilized Indians. The prosecution is based on the act of January 30, 1897, c. 109, 29 Stat. 506,[1] which prohibits, in sweeping terms, the selling, giving, or disposing of any malt, ardent, or intoxicating liquor of any kind to any Indian, a ward of the government, under charge of any Indian superintendent or agent, or any Indian over whom the government, through its departments, exercises guardianship. The line of

[1] That any person who shall sell, give away, dispose of, exchange, or barter any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or other intoxicating liquor of any kind whatsoever, or any essence, extract, bitters, preparation, compound, composition, or any article whatsoever, under any name, label or brand, which produces intoxication, to any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the government, or to any Indian a ward of the government under charge of any Indian superintendent or agent, or any Indian, including mixed bloods, over whom the government, through its departments, exercises guardianship, and any person who shall introduce or attempt to introduce any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or intoxicating liquor of any kind whatsoever into the Indian country, which term shall include any Indian allotment while the title to the same shall be held in trust by the government, or while the same shall remain inalienable by the allottee without the consent of the United States, shall be punished by imprisonment for not less than sixty days, and by a fine of not less than one hundred dollars for the first offence and not less than two hundred dollars for each offence thereafter: provided, however, that the person convicted shall be committed until fine and costs are paid. But it shall be a sufficient defence to any charge of introducing or attempting to introduce ardent spirits, ale, beer, wine, or intoxicating liquors into the Indian country that the acts charged were done under authority, in writing, from the War Department or any officer duly authorized thereunto by the War Department."

legislation of which this is a part (referred to in the margin) [2] originated with the act of 1834,[3] and in its initial form was confined to the Indian country. But this limitation was stricken out by the amendment of 1864, and it was simply required as a substitute that the Indian to whom the sale was made should be under the charge of an agent or superintendent, as the result of which a party who makes a sale where that is the case is liable, wherever it may be. It was accordingly held in United States v. Holliday, 3 Wall. 407, 18 L. Ed. 182, that a sale was within the act, notwithstanding the fact that the Indian to whom it was made was one of the Chippewa Nation, the tribal organization of which had been practically dissolved, who was living on lands which had been certified to him individually; it being further shown that he received an annual allowance from the government, which was distributed to him, with others, through the head men of the tribe to whom it was paid over by the proper Indian agent. "The policy of the act," says Miller, J., "is the protection of those Indians who are by treaty or otherwise under the pupilage of the government from the debasing influence of the use of spirits; and it is not easy to perceive why that policy should not require their preservation from this, to them, destructive poison, when they are outside of a reservation, as well as within it." Following this, it was held in U. S. v. Osborn (D. C.) 2 Fed. 58, that the sale was a prohibited one, although the Indian, who belonged to a tribe on a reservation under charge of an agent, had been permitted to live off of it for eight or ten years as a domestic in a farmer's family. And in U. S. v. Earl (C. C.) 17 Fed. 75, a similar ruling was made; the contention that an Indian must be not only potentially but actually under the charge of an agent not being sustained. In U. S. v. Hurshman (D. C.) 53 Fed. 543, a sale to an Indian of the Nez Perces tribe, who was at the time a regularly enlisted soldier in the army, on duty at Ft. Walla Walla, was held to offend. See, also, U. S. v. Flynn, 1 Dill. 451, Fed. Cas. No. 15,124; U. S. v. Burdick, 1 Dak. 142, 46 N. W. 571; Renfrow v. U. S., 3 Okl. 170, 41 Pac. 88.[4]

The act of 1897 is even broader in its terms than those which had preceded it. By it, as we have seen, a sale is prohibited "to any Indian, a ward of the government under the charge of an Indian superintendent or agent, or any Indian, including mixed bloods, over whom the government through its departments exercises guardianship." There can be no doubt that this extends to the Indian boys at Carlisle. Temporarily transferred from the reservations to which they belong, which, as declared by Judge Deady in U. S. v. Clapox (D. C.) 35 Fed. 575, are themselves in the nature of schools, they are potentially, if not actually, under the superintendents or agents there in charge. And, maintained and educated as they thus are at the expense of the government, under the direction of the Interior Department, they are the unquestioned wards of the nation, which has as much concern to protect

---

[2] Act June 30, 1834, c. 161, § 20, 4 Stat. 732; Act March 15, 1864, c. 33, 13 Stat. 29; Act Feb. 27, 1877, c. 69, 19 Stat. 244; Rev. St. § 2139; Act July 23, 1892, c. 234, 27 Stat. 260; Act Jan. 30, 1897, c. 109, 29 Stat. 506.

[3] See, also, Act July 9, 1832, c. 174, § 4, 4 Stat. 564.

[4] But in U. S. v. Lucero, 1 N. M. 443, and U. S. v. Varela, Id. 601, a sale to a Pueblo Indian was held not to be illegal.

them from the debasing influence of liquor as if they were on the Western plains. Direct and positive proof of this concern, moreover, has been given. By Act of May 20, 1886, c. 362, 24 Stat. 69, it is required that the nature and hygienic effect of alcoholic drink and narcotics shall be specially taught to all pupils in Indian schools; any officer neglecting or refusing to do so being liable to removal. This may not impose on the act under discussion a construction which is not lawfully there, but it at least warns us not to relax its terms. And, more than this, it affords proof of the guardianship intended by the government to be extended in this very matter over these its wards.

The rule for a new trial is discharged.