## UNITED STATES v. WARD.

*(Circuit Court, S. D. California.    May 1, 1890.)*

**INDIANS—CRIMINAL OFFENSES—HALF-BREED.**
   The son of a negro father by an Indian mother is not an Indian, within the mean ing of Act Cong. March 3, 1885, (23 St. at Large, 385,) providing for the punishment of Indians committing certain offenses, as the child follows the condition of the father.

Indictment against Francisco Ward, alleged to be an Indian.
*Willoughby Cole,* U. S. Atty.

*George J. Dennis*, for defendant.

Ross, J. If the defendant is, as is alleged in the indictment, and as is claimed by the district attorney, an Indian, it is clear that he is not embraced by section 5345 of the Revised Statutes; for that section is one of the general laws of the United States in relation to crimes committed in places within their exclusive jurisdiction, from which, by virtue of sections 2145 and 2146 of the Revised Statutes, crimes committed in the Indian country, by one Indian against the person or property of another Indian, were excluded. *Ex parte Crow Dog*, 109 U. S. 567–570, 3 Sup. Ct. Rep. 396. The first statute of the United States making Indians triable and punishable by the United States courts was the act of March 3, 1885, (23 St. at Large, 385,) which reads as follows:

"That, immediately upon and after the date of the passage of this act, all Indians committing against the person or property of another Indian or other person any of the following crimes, namely, murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny, within any territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such territory relating to said crimes, and shall be tried therefor in the same courts and in the same manner, and shall be subject to the same penalties, as are all other persons charged with the commission of said crimes, respectively, and the said courts are hereby given jurisdiction in all such cases; and all such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties, as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

Prior to this act, it had been the policy of the government to permit the Indians preserving their tribal relations to regulate and govern their own internal and social concerns. But by this act congress made a radical change in the pre-existing policy, and thereby subjected the offenses therein defined to the jurisdiction of the United States tribunals. It is under and by virtue of that act that the indictment in the present case was found, and by which it must be governed. Manifestly, to bring a defendant within the provisions of the act, he must be an Indian; and it was therefore necessary that the indictment should allege the defendant to be an Indian. Such allegation being necessary, it is of course essential that the proof should correspond; for it is a cardinal rule in criminal procedure that every material averment of the indictment must be established by proof to justify a conviction. In the present case, it is a fact conceded by the respective counsel that the defendant's father was a full-blooded negro, and his mother a full-blooded Indian; that he was taken by his father, when very young, from the reservation where he was born to reside with the father in Los Angeles city, and he did so reside for a number of years, but has since returned to and lived on the reservation, where the offense in question is alleged to have been committed. And the question now raised is whether the defendant is an

Indian, within the meaning of the act of March 3, 1885. If his parentage was a matter about which there was conflicting evidence, or if the fact in relation to it was not conceded, it would have to be passed upon by the jury, along with all the other facts of the case; but, being conceded, it is useless to go into the circumstances of the alleged offense, if it be true, as contended by counsel for defendant, that he is not an Indian, within the meaning of the statute upon which the indictment is founded. The statutes of the United States nowhere define an "Indian." As a matter of fact, the defendant is no more an Indian than he is a negro, and no more a negro than he is an Indian. In the case of *U. S.* v. *Sanders,* Hemp. 486, the court held that the quantum of Indian blood in the veins did not determine the condition of the offspring of a union between a white person and an Indian, but further held that the condition of the mother did determine the question; and the court referred to the common law as authority for the position that the condition of the mother fixed the *status* of the offspring. In the subsequent case of *Ex parte Reynolds,* 5 Dill. 403, the court said that the first point decided in the *Sanders Case* was sustained by the common law, as also the last point, if applied to the offspring of a connection between a freeman and a slave. But in *Ex parte Reynolds* the court pointed out that—

"By the common law this rule is reversed with regard to the offspring of free persons. Their offspring follows the condition of the father, and the rule, *partus sequitur patrem,* prevails in determining their *status.* 1 Bouv. Inst. p. 198, § 502; *Ludlam* v. *Ludlam,* 31 Barb. 486; 2 Bouv. Law Dict. 147; *Shanks* v. *Dupont,* 3 Pet. 242. This is the universal maxim of the common law with regard to freemen,—as old as the common law, or even as the Roman civil law, and as well settled as the rule, *partus sequitur ventrem,* —the one being a rule fixing the *status* of freemen, the other being a rule defining the ownership of property; the one applicable to different political communities or states, whose citizens are in the enjoyment of the civil rights possessed by people in a state of freedom, the other defining the condition of the offspring which had been tainted by the bondage of the mother. No other rules than the ones above enumerated ever did prevail in this or any other civilized country. In the case of *Ludlam* v. *Ludlam,* 31 Barb. 486, the court says: 'The universal maxim of the common law being *partus sequitur patrem,* it is sufficient for the application of this doctrine that the father should be a subject lawfully, and without breach of his allegiance beyond sea, no matter what may be the condition of the mother.' The law of nations, which becomes, when applicable to an existing condition of affairs in a country, a part of the common law of that country, declares the same rule. Vattel, in his Law of Nations, (page 101,) says: 'As the society cannot exist and perpetuate itself otherwise than by the children of the citizens, these children naturally follow the condition of their fathers, and succeed to their rights. * * * The country of the father is therefore that of the children, and these become true citizens merely by their tacit consent.' Again, on page 102, Vattel says: 'By the law of nature alone, children follow the condition of their fathers, and enter into all their rights.' This law of nature, as far as it has become a part of the common law, in the absence of any positive enactment on the subject, must be the rule in this case."

It results from these views that the defendant is not an Indian, within the meaning of the statute upon which the indictment is based; and, that

being so, the jury must be directed to return a verdict of not guilty upon the conceded fact in regard to the parentage of defendant, without going into the circumstances of the alleged offense.